Good morning, Your Honors. Michelle Roberts on behalf of Plaintiff Quiller Barnes and the class. With the Court's permission, I'd like to reserve three minutes for rebuttal. I'm sorry, how many? Three minutes. Thank you. So, Your Honors, the plan promises rehired employees who return to work and bridge an augmented benefit that recaptures a discount applied to their benefit when they first terminated. And there is no dispute in this case that plaintiff and the class bridge their service. In March 2011, Judge Patel concluded that on its face, Section 3.4.D.3 applies to any employee who is eligible to receive an ATB annuity. And it was undisputed that Barnes was eligible to receive an ATB annuity, notwithstanding his subsequent election to receive his pension in the form of a lump sum cashout. That was Judge Patel's view. Judge Chin said that's not the only possible view. Your Honor, I believe it's the only reasonable interpretation of the plan. So you think... If you're wrong about that, I mean, if it's ambiguous, if Judge Chin could have one possible reading and Judge Patel another possible reading, what do we do then? Does the plan administrator get to decide? Your Honor, let's assume for the moment that the plan is ambiguous, which I don't believe that it is, and I'll go and I'll address that in a moment. Their interpretation of the plan doesn't adhere to all of the relevant plan provisions. And if I may, the reason that their interpretation does not is that it fails to apply proper rules of construction, it adds terms in the plan that don't exist, and it fails to consider other provisions of the plan. And if we start with the actual language of the plan, Section 3.4d.3, the relevant provision was eligible to receive a monthly pension. Now, eligible is undefined in the plan, but I think we can all agree that it means qualified. You are qualified to receive a benefit if the ATB at the time of first termination was your highest benefit, and I don't believe that the parties dispute that. Now, defendant interprets eligible to receive as elected to receive, but the plan contains no such requirements. And there is no permissible construction of the term eligible that permits defendant to apply other conditions into the plan. Now, by its plain terms, the eligibility for the ATB annuity is measured at the time of termination of employment. And this is important because termination of employment is a defined term in the plan. It's the last day that an employee performs work. It's not — and if you look at the language, it says at termination of employment. At is on or about. It's not in connection with. And I think that's where the Court erred, and that's where defendants erred in their reasoning as well. It's also not after. It doesn't say immediately before or immediately after. And that seems to be the difficulty. It seems to be one of the reasons — in fact, I think it's sort of the nub of the reason that Judge Chen found it ambiguous. Your Honor, he found it ambiguous, not eligible to receive ambiguous, but the timing. But if you look at — Well, exactly, counsel. That's my point. It doesn't say — the provision doesn't say just after or just before. It says at. Right. And at termination of employment, their own 30b-6 testified that Barnes was eligible at his prior termination of employment. What he elected, how he elected to receive his benefit, his annuity start date, which is following his termination of employment, doesn't change the fact that at the time that he terminated, he was eligible to receive an ATB annuity. Your response raises another question, if I might inquire. They did have a 30b-6 deponent who made at least one mistake. On the other hand, the — you know, we typically look to the plan administrator as the font of all wisdom in interpreting the plan. What do we do with the 30b-6 deponent's testimony? Well, you know, at a minimum, Your Honor, if you find that the language is ambiguous, it creates a material issue of disputed fact. I mean, at the end of the day, we had proposed or we told them we don't think this voluntary remand in 2011 is appropriate, but consider the — all the evidence that we submitted, including your own deponent's testimony. And they failed to do that. But, counsel, my question is really specific. What do we do with the 30b-6 testimony vis-a-vis the plan's interpretation? I believe that the 30b-6 testimony has to be attributed to the plan's interpretation. You believe it has to be — forgive me. It has to be attributed to? Yeah, that it is the plan's interpretation. How the 30b-6 testified on behalf of the plan has to be attributed to the plan. You mean you think it's binding? I do believe it's binding. Do you have any authority for that? Yes, Your Honor. We cited a couple cases in our — If you're going to — if it's just the cases you've cited in your brief, I don't want to take your time on it. Is that what you're going to call my attention  Yes. Okay. Fair enough. Thank you. No problem. Could I ask you a question? We've given a good deal of deference to people and their plans and where the court doesn't get into it too well. And very often what we decide is based on our standard of review and the district court's standard of review as they review the contract. Do you have any fault with the finding that the court correctly reviewed the Benefit Plan Committee's decision for abuse of discretion with slight skepticism? Yes, Your Honor. I mean, our argument is that de novo review applies here for all the reasons that we set forth in our brief. But I would submit to you, even — you know, regardless of the standard of review — Wait a minute. You just said regardless. I ask the question, why? Why is it de novo? It's de novo because when the issue was before the plan in 2005, they did not exercise discretion in actually interpreting the plan document. There is no evidence that they actually looked at the plan, and it's the trustee's analysis that the court should defer, not its right to use discretion or a mere arbitrary denial. Well, you said the district court was wrong in its standard of review. That's correct, Your Honor. Now, suppose we disagree with you on that. Where does that leave you before us? Well, Your Honor, let's assume that abuse of discretion review applies. With skepticism. With skepticism. You still have to look at their rationale and their reasoning. And I think if you do that, you'll find that the way that they interpret certain terms in the plan don't hold water. And let's assume for the moment that, you know, Judge Patel — I mean, I'm sorry, Judge Chen said, you know, maybe on de novo review we had the better argument. Let's say there's two reasonable interpretations of the plan, one that denies benefits and one that grants benefits. I think you've got to use that conflict of interest factor in favor of plaintiff. Well, yes, that's why we have slight skepticism, but that doesn't mean the district judge was wrong. Why do we say he was wrong? The district judge was wrong because he adopted arguments in order to justify the plan interpretation that the Benefit Plan Committee, which is the entity that has authority to make the decision, did not actually make. Like, with respect to Section 3.13, which provides that if you take a lump sum cash out, that's going to be offset against any next calculated annuity, all of the arguments that the Court adopted with respect to that provision were litigation counsel's arguments, not the Benefit Plan Committee's. So it deferred to an analysis that just wasn't there, and it was litigation counsel's arguments, and that's an appropriate exercise of deference. Are you arguing that the interpretation of BPC was not reasonable? That's correct, Your Honor. And it's unreasonable because their position is that 3.4a applies to Barnes, and that because it applies to Barnes, he doesn't get the benefits under 3.4d3, despite that it's undisputed that he meets the description under 3.4d3. The problem is that 3.4a applies to participants who do not bridge service under Section 7.4, and no one disputes that Barnes bridged service under 7.4. And, in fact, when he was hired, he was given a letter that said, once you complete 5 years of service, we're going to count your prior term of service in the calculation of your benefits, but they didn't. And so what he received was the same. Well, they did. He just chose to take a lump sum that was reduced because actuarily reduced because he left early, right? Are you talking, Your Honor, with respect to the first retirement or the second? The first retirement. He took a lump sum after the first retirement, right? That's correct. He took a lump sum, but it was discounted by 16.33 percent. And so what — Because he left early. Because he, right, didn't have the sufficient age and service requirements. Right. But when he returned to work and bridged, he was supposed to recapture that discount. Well, that's why we're here. You're stating that as an inclusion, but that's the whole gist of the case, right? Yes. That's why we're here. But the plan's interpretation doesn't actually explain why Barnes doesn't bridge under Section 3.4a and why the fact that he did bridge under Section 7.4 doesn't take him out of Section 3.4a. They limit the explanatory clause for example as meaning that this is the only exclusive example, and it's supposed to be illustrative, not limiting. And that's the problem. And what's further problematic about their argument is that the example in 3.4a that they say applies to non-vested pensioners, there's no provision under 3.4d that explains what benefits they get. So frankly, for those non-vested pensioners, 3.4a is a provision to nowhere because it doesn't — there's nothing under 3.4d that provides their benefits. So I would, you know, argue that the most reasonable conclusion is that that and bridged. And because of that bridge — that bridging, he was taken out of 3.4a and brought under 3.4d3. And their — their example — I'm sorry, their reasoning doesn't address why that isn't the case and why that explanatory provision is limited to just people who were not vested at first termination. What about their argument that if you take a step back and view these provisions, it makes sense that this would be the intent of the plan because he took his money out as opposed to the annuitants, deferred or immediate, who left their money in the plan and were denied the time use of the money? Right. Your Honor, that — that economic argument, there's no support for it in the record. I mean, I — defendants are, I believe, trying to paint this picture that he's trying to get something more, and he's not. He is trying to just get the — the discount that was applied to his benefit. And there is no evidence in the record that suggests that he would get something more than the immediate annuities. When he took his lump sum, it was discounted. Considering the present value of money, it was already discounted. And that's not — I mean, that's not really an issue, and he's not trying to get an ATB that's under-reduced. I mean, he — he accepts the fact that if he gets a recalculated ATB, it's got to be offset for what he previously received. That doesn't make him better off than in an annuitant. I see you're down to four minutes. You said you wanted to reserve some time. I would like to reserve three minutes for rebuttal, so. You can have all four. I can have all four. Thank you, Your Honor. Thank you, Ms. Roberts. Good morning. Good morning, Your Honors. Patrick Shea from Paul Hastings on behalf of the AT&T Pension Plan Non-Bargain Program. I think I'd like to start with the language of the plan, because I think if you read the language together, it is clear that the Benefit Plan Committee's interpretation is by far the better reading of that language, and it clearly qualifies as a reasonable interpretation of the plan, which, given the deferential language that is owed under the language that's in the plan and the Firestone and MetLife Beech-Len decisions, should control here, as Judge Chen found below. I start with 3.4a. 3.4 in general is a provision designed to tell the plan participants how the plan will treat a benefit where you've retired first, you've had a benefit under the plan, and you come back and are rehired and have a second benefit under the plan. And it begins with 3.4a, which has the heading no prior benefit. No prior what? No prior benefit. And it's basically telling you that if you have no prior benefit when you are rehired, then the only thing you're going to get is the cash balance that you will accrue upon your second hire. And there's no dispute that when Mr. Barnes was rehired, he had no prior benefit because he had been cashed out by getting a lump sum. And we saw on the record when he was cashed out by getting a lump sum, he was clearly told and acknowledged that he would receive no further benefit based on that service. So it was an eminently reasonable interpretation by the BPC in both decisions here to decide the 3.4a controls. That was also the consistent testimony of the 30b6 deponent, the 3.4a controls. There is no prior benefit. Therefore, all that Mr. Barnes is entitled to is the additional pension money that he will accumulate after his second term. The exclusionary parenthetical talks about where a benefit becomes a liability of the plan. But to do that, you have to have a prior benefit. And as the BPC reasonably determined, what that means is if I have a prior benefit that I haven't gotten paid on because I wasn't vested when I left the first time around, that can become a plan liability under the bridging rules if I come back. But that applies to someone who has a prior benefit. They then, when they come back, are eligible for a monthly pension plan, a monthly pension benefit, and would be covered by 3.4d3. That's an eminently reasonable reading of 3.4a and the one that the BPC adopted and the one that Judge Chen appropriately decided to defer to. Counsel, what do we do with the 30b6 deponent's testimony? Your Honor, for purposes of assessing the level of skepticism, Judge Chen did decide to attribute the 3.4d3 inconsistency to the plan. I personally would disagree with that. My view is that Congress has established a procedure for interpreting a plan. We have this clash, right, because we also have rules of civil procedure, and your client produced this witness as the one most knowledgeable. Her job title certainly indicates she should be knowledgeable about the plan. But she's not the person authorized by the plan nor by Congress under the statutory scheme to interpret the plan. But what do we do about this? To get to my question, what do we do about this clash? I frankly think that the 30b6 testimony was improper, Your Honor. Improper? Improper. Meaning? Incorrect, certainly. It was certainly incorrect, and I wasn't counsel to the plan at this time, but I certainly would have filed a motion for a protective order under those circumstances. And here's why. It's one thing to have a 30b6 witness testify and talk about how the plan is actually operated, and fundamentally that's what Ms. Francis was doing.  the testimony. I think it ultimately corrected its position by submitting it to the proper authority and getting it back to the defense. There was no correction to that deposition testimony, right, counsel? Not within the 30-day rule specified by 30b6. Okay. Fair enough. Okay. So can you help me out on something else? Sure. I think there's this March 22 — oh, I know, the first question. Judge Chin approved a notice about a year earlier before the summary judgment motion to prospective class members. Did that go out? It did, Your Honor. Okay. And then — Although I thought it might have been Judge Patel at that time. I'm not sure if it was Judge Chin or Judge Patel. I thought it was — I guess it doesn't matter. Right. That might be my mistake. March 2010, we have this declaration from Ms. Francis, right? Right. And she says that 3.4d3 applies to every annuitant, deferred or immediate. Yes? Correct. Okay. Then there's a — your team says a misstep in her November deposition where she makes a mistake. I think she was testifying to the way the plan was actually operating, which is what she was familiar with, because the plan was making a mistake. Okay. With respect to deferred annuitants. Okay. Which is what prompted the BPC, which had never been asked to analyze this issue, to look at the issue and issue its August 2011 determination. So then we get to the August 2011 determination, and it goes back to what she said the first time. Right. Okay. So if the plan's opening interpretation, if you will, the March 2010 interpretation, that was its understanding, why weren't those folks being paid? They should have been paid, Your Honor. We're talking about the deferred annuitants. Right. They should have been paid. It was a mistake in the operation. Once that came to the BPC's attention, they fixed that mistake, and those people got paid. Okay. When did you start paying them? We started paying them, I think, immediately after the August 2011 decision. Your Honor, if I can — I believe there were only three individuals in that case. That's my next question. Right. How were those three folks identified? Was it response to the plan notice, or what happened? Can you fill that in for me? The plan consulted its records and was able to determine from its records who fit within those categories. Has there been any judicial determination that there are just three, or where are we on that? I believe the plan produced discovery there were three. I don't believe it's been challenged. And those, as I said, two people. It turns out we'll still get a higher benefit under an alternate formula, and that one person has been fixed and has been paid as part of the resolution of the claims. There were claims with respect to the annuitants. Sorry, I missed that part. There were claims below with respect to the annuitants. Those have all been adjudicated as part of the final judgment. There was actually an award of attorney's fees to plaintiffs about that. They are out of this case, and I believe fully satisfied. Here's what I'm — I'm not trying to be sneaky. I'm just trying to read between the lines and figure out where we're at, because final judgment's been entered in this case. Right. And the plan has, I think, even you would agree, made a mistake and wasn't paying some folks who are entitled to be paid. Right. And so you're asking us to take the plan's word for it that there are three of them. And I'm just concerned. Did these people receive notice? Is there somebody out there? Because there's a final judgment now. So that's what I'm concerned about. Right. No, the final judgment in this case reflects AT&T's concession that the deferred annuitants are entitled to be treated under D-3 and — So they have their declaratory relief? I think there was. There was. I got to go back and consult the judgment, which, honest, I didn't study because I wasn't aware. But, yes, there was extensive discussion with counsel to make sure that they, deferred annuitants, would benefit from the change the plan had made in this case. Do you know if that judgment is in our record? In our excerpt, I should have said. I don't believe it is, but I don't believe it's part of what was challenged. Right. Okay. So if somebody is in Omaha not tuning in live to watch the Ninth Circuit's fascinating oral arguments on this particular topic but wants to come back, it sounds like your position is they've got their declaratory relief, and if they were overlooked somehow, they could essentially file another suit and seek specific performance? Well, I think the judgment in this case binds AT&T to give them that relief. If it speaks to this? I think it does. Okay. I think you've answered my question. Okay. But to get back to the 30B-6, Your Honor, the cases that the plaintiffs cite deal with a witness testifying about a policy in the non-ERISA context. And I think it would stand the statute on its head if the court were to say, you produce a witness, and instead of a committee having 180 days to consider it, to consult with counsel to give their interpretation, that that witness who's giving an on-the-spot, here's how I look at it, that that somehow becomes binding from a standpoint of deferential review. I think it would completely upend the statutory process, and that's what's important to keep in mind. Turning to the language of D-3, it doesn't apply. Because the premise of D-3, right in the heading, is you have to have a prior benefit. Mr. Barnes had no prior benefit because he had been cashed out. Secondly, you have to be receiving or eligible to receive an annuity. And once you elect a lump sum, you are no longer eligible to receive an annuity. That's the difficulty with that language, isn't it? If you're receiving, then that's the moment after your termination, because you've elected to receive it. By saying eligible to receive or receiving, there is a suggestion that eligible to receive temporally refers to the moment prior to termination. You see, I think at logically means at or around or in connection with. And if you're making an election at that point in time, you are no longer eligible to receive. And that's, I think, confirmed by if you look at D-1 and D-2, which are clearly referring in D-1 to immediate cash balance recipients and D-2 in terms of deferred recipients. They use the exact same language. But isn't this why your strongest argument is this is ambiguous, right? Judge Patel got to one destination and Judge Chen got to another. It is ambiguous both. But I think the better reading of the language is the one that gives meaning to both provisions. And if it is ambiguous, you defer to a reasonable interpretation by the BTC. There's a conflict here, right? And yet your position, I think, is that Judge Chen should not have viewed the plan's interpretation with some skepticism. Is that right? Well, I argued that below. I lost below, and it was viewed with slight skepticism for the reasoned opinions that Judge Chen gave. But even saying that, no matter what the level of skepticism is, if it's a reasonable interpretation under Avate and under Glenn v. MetLife, you would defer to a reasonable interpretation, and that's what we have here, especially because it makes sense from a structural perspective. As we indicated in our briefs, it makes sense to treat an annuitant who either is going to lose the value of their ongoing annuity when they're rehired or defer to an annuitant who's not going to get anything until 65, differently from somebody like Mr. Barnes, who's cashed out over $300,000 and has had the benefit of almost seven years of time value of money when he resumes. By contrast, the explanation that plaintiff wants to give makes no sense whatsoever. If you would believe plaintiff, they believe the language, or eligible to receive a monthly pension, was inserted just to disqualify people whose benefit was less than $3,500 on a present value basis and who therefore would be the only people not eligible to receive additive benefits. One, I don't think structurally it makes any sense to disqualify that small group, but if that's what you intended, it would have been much easier to say everyone is covered except people who have less than the $3,500 benefit. You wouldn't have spoken in this kind of code that you have to go through all these hoops to get to. That's why I believe the better reading of the language is the one proffered by the BPC. Now, in terms of standard of review, it's clear you have Firestone-type language in this case, so some deference is owed. I think plaintiff's argument about de novo review can best be qualified as half-hearted. One, they say the BPC in its first decision did not actually interpret the language, but the record is to the contrary. There's a memo to the BPC that specifically quotes the language of 3.4a. Isn't there a stronger argument that the former employee didn't really get an explanation, that he was left in the dark? What about that? So I lost on that one below. I hate to keep bringing up these sore subjects, but it's a fair point, isn't it? Judge Chen certainly thought so, ruled against me, but ruled that there was no substantive harm because by the time we got to that issue, there was a fully explained BPC opinion in the record to look at. The employee had to work pretty hard to get there. That's her point. That's her point. They worked hard to get there, but you know what? It's not all in the BPC. The 3.4d.3 issue was not raised by Mr. Barnes. He was represented by counsel. His argument was a completely different one, which was I should get paid double. And he asserted that even when he got to Federal court. Mr. Barnes, to his great credit, got very competent counsel who came in and completely changed the argument. But when you completely change the argument, it's only reasonable to let the BPC take a look at that argument and exercise the authority that Congress gives it to issue a reasonable interpretation, which is exactly what happened here. So it's clear that they exercised, I think, discretion the first time. It's crystal clear they exercised discretion the second time, and there's nothing improper about that. The Supreme Court in the Conkright decision said even when you overrule a plan administrator and you formally remand it to them, you're entitled to that absent evidence of bad faith. Judge Chen took all the evidence here and the light most favorable to Mr. Barnes and found no evidence of bad faith, and therefore applied an appropriate level of deferential review. Lastly, there's this argument there should have been a trial. Lastly, there's this argument there should have been a trial. Addressing the third argument, no need for a trial here. You review ERISA decisions on the record as submitted to the Court. You do that on cross motions for summary judgment. It's the way it's done all the time. The only instance where you need a trial, as outlined in the Nolan v. Heald College case, is if there's a factual dispute about conflict of interest in an extremely close case where it might make a difference in the determination. There, it was an issue where the judge had failed to consider the bias of doctors examining a disability case. It was a very close case because three treating physicians said the plaintiff was disabled. In that situation, it would make sense. You don't need a trial here when we're dealing with plan interpretation and where the was a reasonable one. Thank you, Mr. Shea. Ms. Roberts, you've got about four minutes left. Thank you, Your Honors. There's a few points that I'd like to address that was raised by Mr. Shea. With respect to the timing of election, that can't determine eligibility because you can, although the BPC said that Barnes elected to receive his annuity in the form of a lump sum prior to his end date, he didn't actually submit the form until after he ceased work. And you have until the end of a 90-day election period to make that election. So according to the benefit plan's interpretation, if you take it to its logical consequence, anybody who just waits until after their last day of work to submit the election would be entitled to the benefit. And that doesn't make any sense. And with respect to their criticism of the argument that the broad language of 3.4D3 only excludes people who were eligible to receive a really small lump sum in the value of $3,500, that was just one example of, you know, that we had proffered. But this idea that, you know, this provision doesn't exclude very many people, according to their interpretation, they're only paying one person under 3.4D3, one deferred annuitant that they say is entitled to benefits. That doesn't make any sense. There are a number of people who are entitled or eligible to receive an ATB annuity that aren't getting that benefit. And it was only until years into the litigation that they decided to correct that problem after they had to revisit their interpretation. Has that problem been corrected now? My understanding is that based on the few people that they identified, that it's been corrected. And there is a – Do you have any reason to contradict it, I take it? I have no reason, Your Honor, at this point. No one's, you know, come to us and said that they didn't receive the benefit. Okay. But it's telling. I mean, you have a plan provision that's supposed to cover – that's supposed to pay benefits. And you're only paying one person benefits out of the hundreds of people that have worked for you. You're rehired and returned to work and bridged. And that doesn't make any sense. Is counsel correct that the notice went out? Opposing counsel said the notice went out to prospective class members? The notice went out to the prospective class members that they identified. So that included the three deferred annuitants. Well, of course, I'm concerned about the fourth deferred annuitants. I'm concerned about somebody falling between the cracks. Right. And this is essentially to use – we have visitors here today. This is essentially a suit seeking a declaration, declaratory relief about the interpretation. Exactly. Does the final judgment make clear that folks in that category are entitled to relief? So if they haven't been identified yet, they could come forward and sue for – basically for specific performance? Yes, Your Honor. So that's not an issue? Yes. I believe that one of the last things we did when we wrapped up the case was we made sure that they – that this was in stone, in writing, that anybody was later identified that they would get the benefits. Thank you, counsel. Okay. Great. And then with respect to just, you know, the 3.4a and the 3.4d3 issue, I just want to say that, you know, the title of no prior benefit doesn't apply to Barnes. He had a prior benefit. The people who didn't have a prior benefit were the non-vested pensioners. He meets the description under 3.4d3 to a T. He had a prior benefit that was based on his termination, you know, before March 26, 1996, and his participation resumed in the plan. And at the end of the day, what the BPC did not do was interpret Section 7.4 and the bridging rules, and they don't explain why Barnes did not bridge for purposes of 3.4d3. And if they're the body who's supposed to be making this decision, you can't rely on counsel's arguments about why 7.4 doesn't apply here. At the end of the day, the BPC did not, in 2005, neither in 2011, make a decision that interpreted all of the relevant plan terms. And, Your Honor, I would submit to you we don't need another — we don't need a 2015 BBC decision. I think the Court can enter judgment in Plaintiff's favor just based on the language of the plan. Without Your Honor — Roberts, I think that's — Submit Plaintiff's case. Thank you. Thank you very much, Ms. Roberts. Mr. Shea, thank you, too. The case just argued is submitted.
judges: Wallace, Silverman, Christen